UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TONI HILDERBRAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16-CV-405 (CEJ) |
| | ) | |
| NANCY A. BERRYHILL[1], Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On December 28, 2010, plaintiff Toni Hilderbrand protectively filed an application for supplemental security income and disability insurance benefits with an alleged onset date of December 1, 2007. (Tr. 237–51).[2] Plaintiff's application was denied on initial consideration on April 1, 2011, (Tr. 107–09, 135–39), and she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 140–49).

Plaintiff and counsel appeared for a hearing on May 30, 2012. (Tr. 74–95, 206).[3] The ALJ issued a decision denying plaintiff's application on November 21, 2012. (Tr. 110–29). The Appeals Council vacated the hearing decision and remanded the case to the ALJ. (Tr. 130–34). The ALJ conducted additional proceedings, holding another hearing on July 17, 2014, and once again denied

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.
[2] Plaintiff filed this application for supplemental security income and disability insurance benefits pursuant to 42 U.S.C. §§ 1381–1385 and 42 U.S.C. §§ 401–434, respectively.
[3] Plaintiff initially appeared before the ALJ on January 23, 2012, without counsel. (Tr. 96–106). After a colloquy with the ALJ, plaintiff decided to retain counsel, and the hearing was rescheduled. Id.

plaintiff's application on December 2, 2014. (Tr. 30–49, 50–73, 210–15). That same day plaintiff amended the onset date of disability to October 3, 2011. (Tr. 276). When the case appeared again before the Appeals Council, it denied plaintiff's request for review on February 9, 2016.[4] (Tr. 1–5). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In a December 28, 2010, Disability Report (Tr. 288–98), plaintiff listed her disabling conditions as "right hip," swollen knee and feet, "legs," depression, insomnia, and coronary eye disease. Plaintiff claimed that these conditions prevented her from working, beginning in April 2010. (Tr. 292). An updated report (Tr. 323–30), indicated that beginning in March 2011, plaintiff experienced worsening depression and anxiety, as well as increased bruising and heaviness of her legs. (Tr. 323). Plaintiff also noted that she could not stand for long periods of time or walk to her mailbox. (Tr. 327). Additionally, plaintiff stated that she had difficulties getting in and out of the bathtub; she also needed to purchase a shower chair. *Id.* To treat her health conditions, doctors prescribed numerous medications including Alprazolam for depression[5], Clonidine as a "water pill,"[6] Pravastatin for high cholesterol, Ranitidine[7] for generic "stomach" issues, and Spironolactone for

---

[4] Plaintiff requested the review of the ALJ's decision on January 6, 2015. (Tr. 29).

[5] Alprazolam belongs to the class of medications known as benzodiazepines and is used to treat anxiety and panic disorders. http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a684001.html (last visited on June 28, 2011).

[6] Clonidine is indicated for treatment of hypertension. See Phys. Desk. Ref. 843 (61st ed. 2007). It is also used in the treatment of alcohol and narcotic withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html (last visited Mar. 9, 2011).

[7] Ranitidine is indicated in treatment of duodenal ulcer, GERD, and erosive esophagitis. See Phys. Desk. Ref. 1633-35 (65th ed. 2011).

blood pressure.[8] (Tr. 295). Plaintiff's updated disability report reflected some changes in her prescription medication regimen. Additionally, the stated reasons for medications changed. In particular, she held prescriptions for Celexa to treat depression,[9] Xanax for anxiety,[10] Clonidine for blood pressure, Spironolactone as a "water pill," Pravastatin for cholesterol,[11] and Ranitidine for acid reduction. (Tr. 326).

In a Function Report dated January 10, 2011, (Tr. 311–22), plaintiff stated that she lived in a mobile home with her husband. In response to a daily activities inquiry, plaintiff explained that she typically started each day at about 7:00 a.m. by making coffee and breakfast and giving her husband an insulin shot. *Id.* After completing those initial morning tasks, plaintiff performed some household chores. (Tr. 311). She intermittently sat down and rested before continuing her housework. *Id.* Around lunchtime plaintiff would "try" to make a sandwich; she then lay on the couch watching television, looking out the window, or talking on the phone to her children. *Id.* Plaintiff prepared dinner, washed dishes, and went to bed at around 11:00 p.m. *Id.* Plaintiff noted that she struggled with insomnia and watched television to try to fall asleep. *Id.* But she woke up approximately every hour during the night. *Id.* Plaintiff attributed her sleep issues to insomnia, depression, and headaches. (Tr. 312).

---

[8] Spironolactone is prescribed to treat various conditions including hyperaldosteronism, low potassium, heart failure, high blood pressure, and edema caused by liver or kidney disease. https://medlineplus.gov/druginfo/meds/a682627.html (last visited May 30, 2017).

[9] Celexa, or Citalopram, is prescribed to treat depression. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[10] Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

[11] Pravastatin is used to reduce the risk of heart attack and stroke and the need for surgery in people who already have heart disease or may develop heart disease. https://medlineplus.gov/druginfo/meds/a692025.html (last visited May 30, 2017).

Plaintiff stated that she did not have any problems tending to her personal care, including dressing, bathing, caring for hair, shaving, feeding herself, or using the toilet. *Id.* She did not require any special reminders for dressing, grooming, or taking medication. (Tr. 313). Moreover, plaintiff prepared her own meals daily, and made enough dinner for herself and her husband. Generally, she spent thirty to forty-five minutes preparing meals. *Id.* She reported no changes to her cooking routine since the onset of her disability. *Id.*

Plaintiff recounted that she could do laundry, clean dishes, cook, vacuum, and clean the bathroom. *Id.* She added that she worked on these tasks "off and on" throughout the day. *Id.* But, she said, she had "no desire" to do these tasks. *Id.* She emphasized that she needed encouragement to do her chores, because she only wanted to lie around. *Id.* Furthermore, leg pain and swelling inhibited her ability to do yard work. (Tr. 314). Plaintiff's disability did not affect her ability to handle money – she could pay bills, handle a savings account, count change, and use a checkbook or money orders. *Id.*

Plaintiff left her home about one or twice each week to get mail, go to the store, or take her husband to a doctor's appointment. (Tr. 314). She went grocery shopping for about two hours twice each month. *Id.* She could go out alone, and would either walk, drive, or ride in a car. *Id.* She also described several hobbies and interests, including bowling and crafts. (Tr. 315). Plaintiff said she did not engage in these activities often because she had "lost interest." *Id.* She could no longer bowl because her "legs bother" her. *Id.*

Plaintiff spoke to her children on the phone and she visited her son and granddaughter a couple of times each month. *Id.* She did not need reminders to go

places and did not have to be accompanied by anyone. *Id.* She also had no problems getting along with family, friends, neighbors, or others. (Tr. 316). But, she noted, she did not "feel like getting out of the house" and was "irritable and depressed." *Id.*

Plaintiff reported that her conditions affected her memory, ability to complete tasks, and concentration. *Id.* She could only pay attention for twenty minutes at a time and could not finish what she started. *Id.* But, she could follow written instructions "pretty well" and spoken instructions "o.k." *Id.* She got along with authority figures and had never been fired or laid off from a job because of problems interacting with others. (Tr. 317). She struggled to handle stress, as she was "more agitated" and "depressed all the time." *Id.* Plaintiff stated that she did a "fair" job handling changes in routine. *Id.* Plaintiff added that she had noticed unusual behaviors or fears, and specifically described her anxiety issues, insomnia, and headaches. *Id.* In her narrative plaintiff stated that she had to "work hard to get up in the morning" and get "motivated." (Tr. 318). Plaintiff felt "tired all the time, depressed," and "agitated." *Id.* Moreover, she worried about money and family issues. *Id.* Plaintiff explained that her conditions inhibited her ability to squat, bend, stand, walk, kneel, and climb stairs. (Tr. 316).

In a Work History Report plaintiff set forth the positions she held between October 2002 and April 2010. (Tr. 299–310). Plaintiff worked in housekeeping and maintenance at a nursing home from October 2002 to 2006. (Tr. 299). She worked eight hours a day, five days a week. (Tr. 302). Her duties included cleaning rooms, moving residents, doing maintenance work, cutting grass, waxing and buffing floors, cleaning the carpets, and taking out the trash. *Id.* Plaintiff used machines,

tools, and equipment, and employed technical knowledge and skills in that role. *Id.*

She also wrote or completed reports. *Id.* The physical demands of the job included

eight hours of walking or standing, thirty minutes of sitting, two hours of climbing

or kneeling, three hours of stooping or crouching, one hour of crawling, five hours

of reaching, and eight hours of handling large or small objects. *Id.* Plaintiff

frequently lifted twenty-five pound objects, and the heaviest objects she lifted

weighed fifty pounds. *Id.* Although plaintiff was a "lead worker" she did not hire or

fire other employees. *Id.*

From February 2007 until December 2007 plaintiff worked as a deli and

seafood clerk at a grocery store. (Tr. 299). She worked eight hours each day, five

days every week. (Tr. 301). Her duties as a clerk included waiting on customers,

cooking and cutting food, and cleaning. *Id.* Plaintiff also used machines, tools, or

equipment; she employed technical knowledge or skills, and wrote or completed

reports. *Id.* The job required frequent lifting of objects weighing up to ten pounds;

she had to carry buckets, as well as meats and cheeses to the deli counter. *Id.* The

heaviest objects plaintiff lifted weighed twenty pounds. *Id.* The job also required

eight hours of walking and standing, thirty minutes of sitting, no climbing or

crawling, one hour of stooping or kneeling, two hours of crouching, and seven

hours of reaching or handling large or small objects. *Id.* This position did not entail

supervisory duties and she did not fire or hire employees. *Id.*

In March 2008, plaintiff worked as a housekeeper. (Tr. 299). Her job

responsibilities included cleaning windows and bathrooms, vacuuming, mopping

floors, and taking out the trash. (Tr. 304). In that role, she frequently lifted objects

weighing twenty-five pounds or more. She spent seven hours a day handling large

objects, reaching, writing or handling small objects, walking, and standing. *Id.* She spent one to three hours climbing, sitting, kneeling, crouching, crawling, or stooping. *Id.* She also used machines, tools, or equipment; she employed technical knowledge or skills; and she wrote or completed reports. *Id.* Plaintiff did not serve as a "lead worker" and did not supervise other people. *Id.* Accordingly, she did not hire or fire employees. *Id.*

Plaintiff worked as a cashier at a gas station from August 2008 to October 2008. (Tr. 299). She worked for eight hours each day, five days a week. (Tr. 303). She had a host of duties including waiting on customers and answering the phone. *Id.* In so doing, she used machines, tools, or equipment, and employed technical knowledge or skills. *Id.* Also, she wrote or completed reports. *Id.* The physical demands of the job included about two hours of walking, eight hours of standing, one hour of climbing, stooping, or crouching, no kneeling or crawling, thirty minutes of sitting, and eight hours of reaching and handling large or small objects. *Id.* She frequently carried objects weighing twenty-five pounds and had also carried an object weighing fifty pounds.

Plaintiff's last job was in April 2010 when she worked for four days as a cake decorator at a grocery store. She worked eight hours each day. (Tr. 300). She sliced and packed bread, decorated cakes, carried cakes and buckets of icing, and waited on customers. *Id.* The daily physical requirements of plaintiff's position involved eight hours of walking, eight hours of standing, thirty minutes of sitting, no climbing or crawling, five hours of stooping, one hour of kneeling and crouching, and seven hours of reaching and handling both large and small objects. *Id.* Plaintiff frequently lifted ten-pound objects in that job. *Id.* She did not serve in a

supervisory role; she did not hire or fire employees. *Id.* She needed to utilize machines, tools, or equipment. *Id.* Her duties required that she employ technical knowledge or skills. Furthermore, she completed or wrote reports. *Id.*

**B.** **Testimony at Hearings**

### May 2012 Hearing[12]

Plaintiff was 50 years old at the time of the hearing. She had completed the eleventh grade and obtained her GED. (Tr. 80). She started attending beauty school, but quit after six months because she could not stand for extended periods of time. *Id.* Although plaintiff alleged a disability onset date in December 2007, she worked occasionally in the years after that. *Id.* She also testified that since December 2007 she had not volunteered with any organization or filed unemployment or worker's compensation claims. *Id.* Plaintiff testified that she did not have any insurance or income at the time of the hearing. (Tr. 80–81). Plaintiff also stated that did not receive any form of public assistance other than $262.00 per month in food stamps. (Tr. 81).

Plaintiff testified about her duties at Fontainbleau Nursing Center, where she worked as a housekeeping employee from 2003 to 2005. *Id.* She testified that she fixed water leaks and cut the grass. *Id.* Also, she moved residents, buffed the floors, cleaned carpets, and changed light bulbs. *Id.* Plaintiff testified that she left this job because she got married and moved away. *Id.* Plaintiff stated that she never suffered from alcohol problems, used illegal drugs, or used prescription drugs that were not prescribed to her. (Tr. 82). Moreover, she testified that she has never been questioned by the police for a misdemeanor or felony. *Id.*

---

[12]   Plaintiff had an initial hearing on January 23, 2012. At that time she decided to retain counsel, so the hearing was rescheduled. (Tr. 97–106).

In response to questioning by her counsel, plaintiff testified that swelling and "severe pain" below her knees prevented her from working. *Id.* Because of the pain, she had to "prop" up her legs every ten minutes or at least once an hour. (Tr. 83–84). Plaintiff believed she spent about half the day with her legs propped up. (Tr. 84). She stated that it is difficult to stand for more than twenty minutes. (Tr. 83). And walking 100 yards to the mailbox was very difficult as well. *Id.* Plaintiff had been treated for this condition for about two and a half years by Dr. Klemm at Great Mines Health Center. (Tr. 83–84). Plaintiff testified that Dr. Klemm prescribed Flexeril[13] which caused drowsiness, but did not mitigate her sleeping problems. (Tr. 84). Plaintiff testified that only rest alleviated her leg swelling. *Id.*

She also testified that she struggled with anxiety and depression. (Tr. 82). Plaintiff described her anxiety as "really bad." (Tr. 85). Anxiety caused plaintiff to experience chest pains, racing heart, sweating, and panic attacks several times each week. *Id.* Plaintiff testified that crowds triggered her panic attacks; it therefore became difficult to leave the house for doctor's visits or shopping. (Tr. 86). During the course of a panic attack, which typically lasted for about twenty to thirty minutes, plaintiff had a racing heart, felt "real nervous," and could not breathe. (Tr. 85). She further testified that the panic attacks were unpredictable. *Id.* She took Xanax or Celexa to ease the symptoms of the panic attacks, but the medications had a delayed effect. *Id.* She had endured panic attacks of this severity for several years. (Tr. 86).

---

[13] Flexeril – or Cyclobenzaprine – is a skeletal muscle relaxant, which is combined with rest, physical therapy, and other treatments to relax muscles and relieve pain caused by muscle injuries. https://medlineplus.gov/druginfo/meds/a682514.html (last visited May 30, 2017).

Plaintiff also testified that depression inhibited her ability to accomplish anything. (Tr. 86). She could not get out of bed several days during the week. (Tr. 86). Her depression did not diminish her capacity to dress or bathe, and did not precipitate suicidal thoughts. (Tr. 86–87). But, she did have crying spells, lasting approximately thirty minutes, about three times a week – separate and apart from her panic attacks. (Tr. 87). Plaintiff testified that her panic attacks and crying spells interrupted her activities. *Id.*

Plaintiff testified that she had suffered from insomnia for about a year and, as a result, was able to sleep for only one or two consecutive hours. (Tr. 90). Plaintiff also had nightmares (sometimes occurring during the day) and "trust issues" which she believed stemmed from a physically and emotionally abusive previous marriage. (Tr. 87–88). The experience of being abused did not affect how she felt when she went out in public. (Tr. 88).

Plaintiff testified that she could do some chores. *Id.* She would "try" to vacuum, but often failed to finish. *Id.* She would vacuum for ten minutes, but would then require fifteen minutes of rest. (Tr. 89). Moreover, she did laundry but then needed to sit down to fold it. *Id.* She could not cook on a regular basis because she could not stand at the oven. (Tr. 88). Plaintiff's husband did the grocery shopping. (Tr. 90). She did not do any work outside on a lawn or garden, and did not belong to any social groups. (Tr. 90).[14]

## July 2014 Hearing

At the time of the July 2014 hearing, plaintiff was living with her husband, who was disabled. (Tr. 37). She held a valid driver's license, but did not drive due

---

[14] Vocational specialist testimony from this first hearing will not be described here.

to an outdated eyeglasses prescription. *Id.* She last drove about three months prior to the hearing. *Id.*

Plaintiff testified about her educational and employment background. (Tr. 37–38). She had not worked since October 2011. (Tr. 38). Plaintiff testified that she worked at a nursing home for four years where she did housekeeping and later did maintenance work. (Tr. 39). Her duties included cleaning carpets, buffing floors, changing light bulbs, fixing plumbing, and cutting grass. *Id.* The heaviest object she lifted at that job weighed about fifty pounds. (Tr. 40). Plaintiff left that position when she moved away. *Id.* She testified that she could no longer fulfill the duties of that job. *Id.*

Plaintiff testified that she did not have any pending worker's compensation claims or health insurance at the time of the hearing. (Tr. 38). She did, however, have a pending Medicaid claim. (Tr. 38–39). Plaintiff claimed that no medical professional in the last fifteen years told her she had an alcohol problem. (Tr. 41). And she stated that she had never used any illegal drugs or non-prescribed medications. *Id.*

Plaintiff testified that she began using a cane because she tore her right ACL. (Tr. 42). She claimed that she could not stand for long periods of time because of knee swelling; she needed to prop up her legs every day to manage the swelling. (Tr. 42-43).

Plaintiff testified that depression and anxiety prevent her from leaving the house, as she would get panic attacks. (Tr. 40–41, 43–44). Plaintiff added that she had daily panic attacks; although the attacks lasted only five minutes, it took plaintiff two hours to recover from them. (Tr. 41–42). Because of the attacks, for

the last couple of years plaintiff's husband did the grocery shopping. (Tr. 43). Plaintiff also attributed her insomnia to her depression. *Id.* She stated that she only slept two full hours each night. (Tr. 44). She stated that she had dealt with these sleeping problems for four or five years. *Id.* Additionally, depression affected plaintiff's appetite and ability to prepare her meals; therefore, she generally ate only one meal each day. *Id.* Consequently, she testified, she lost thirty pounds over the course of two to three years. *Id.* Plaintiff stated that she did not take a shower every day. *Id.* Plaintiff also testified that her concentration suffered as a consequence of her anxiety and depression. (Tr. 40). She claimed she did not have any suicidal or homicidal thoughts. (Tr. 43).

In response to questioning by a vocational, plaintiff testified about her prior work experience. (Tr. 45–46). Plaintiff stated that the maintenance work she did at the nursing home did not involve work on the heating or air conditioning system. (Tr. 45). She changed light bulbs but not wall sockets or wall switches. *Id.* Her plumbing duties were limited to plunging toilets. (Tr. 46). The vocational expert testified that plaintiff's prior work at the nursing home was best classified as a hospital cleaner. *Id.* The position was unskilled, medium in the DOT, and medium as described. *Id.*

The ALJ asked the vocational expert about the existence of jobs in the national economy for an individual of the plaintiff's age, education, and work experience who could only perform work at or below light exertional levels; who would be unable to (1) operate foot control operations, (2) climb ladders, ropes or scaffolds, (3) kneel, (4) crouch, or (5) crawl; who could occasionally climb ramps or stairs; who would need to avoid operation or control of moving or hazardous

machinery; who would need to avoid operating at unprotected heights; and who would be limited to occupations involving simple, routine, and repetitive tasks. The ALJ added that the position for that individual would need to be low-stress, with only occasional decision-making and changes in work setting. *Id.* Furthermore, the position would involve no contact with the public and limited, casual interaction with coworkers. (Tr. 46–47).

In response, the vocational expert testified that there were jobs available in the national economy for such an individual. (Tr. 47). He named, for example, a hand packager position. *Id.* There were about 4,000 jobs of that variety in Missouri. Similarly, such an individual could work as a small product assembler. *Id.* There were about 15,000 jobs in Missouri of that variety. *Id.* The vocational expert testified that a mail room clerk position would also be appropriate for such an individual; there were 209 such positions in Missouri. *Id.* These positions would not tolerate more than two unscheduled absences in a month. (Tr. 48).

**D.    <u>Medical Records</u>**

In March 2007, plaintiff reported to Great Mines Health Center. (Tr. 400). Visit notes indicate that plaintiff reported that she had "started a new job where she had to stand for greater than 8 hours," and that "her legs became swollen from the knee to the foot and had fairly significant discomfort associated with it." *Id.* Phillip. R. Cummings, APRN, FNP, observed "no fevers, chills, headaches, chest pain, SOB, nausea, vomiting" or diarrhea. *Id.* He also remarked that plaintiff was "awake, alert and oriented times three" and that her heart, lungs, and abdomen appeared normal. *Id.* He further noted that her extremities showed "no cyanosis, clubbing or edema at this time." *Id.* Plaintiff reported "that she had significant edema but it was

resolved after elevating her legs." *Id.* He diagnosed plaintiff with peripheral edema. *Id.* Further, Nurse Cummings noted a treatment plan, writing that "[a]s I discussed with this patient back in December, she needs to be wearing compression stockings. Now that she is working and standing in one place on concrete floors for over 8 hours it is even more important that she wear the stockings while she is working. The patient verbalized understanding and will try to obtain a pair of stockings for work." (Tr. 400). He noted that plaintiff received a refill of Doxepin.[15] *Id.*

Plaintiff had an eye exam on December 3, 2007. (Tr. 377–79). Medical records indicate that early Fuchs Endothelial Dystrophy was observed; plaintiff's mother also had that condition. (Tr. 377). Plaintiff stated that she had no endocrine, ocular, allergy, cardiovascular, respiratory, gastrointestinal, genitourinary, integumentary, neurological, hematologic, ear/nose/mouth/throat, or constitutional issues. (Tr. 378). Notably, she also indicated that she did not have any musculoskeletal issues, such as muscle aches, joint pain, or swollen joints. *Id.* She also signified that she did not have depression or anxiety. *Id.*

Records from Parkland Health Center indicate that plaintiff took an ambulance to the emergency room on March 2, 2008, complaining of swollen legs with pain below the knees. (Tr. 382). Records indicate that she told Laong Garcia, M.D., that her symptoms had worsened in the last three days, but the condition existed for three weeks. (Tr. 382, 384). And she registered her pain as an eight out of ten. (Tr. 384). No known trauma was reported. (Tr. 382). Walking, but not standing or stair-climbing, apparently aggravated the condition. *Id.* Plaintiff stated

---

[15] Doxepin is used to treat depression and anxiety. https://medlineplus.gov/druginfo/meds/a682390.html (last visited May 30, 2017).

that rest and elevation served as alleviating factors. *Id.* Dr. Garcia noted that plaintiff's appearance, skin, and neurovascular appeared normal, and edema was flagged. *Id.* Warmth and swelling were observed below plaintiff's knees. *Id.* Dr. Garcia's differential diagnoses (or preliminary diagnoses) showed that plaintiff had phlebitis or DVT (deep vein thrombosis) and cellulitis. *Id.* Plaintiff received lab tests and an x-ray, which showed "no acute changes." (Tr. 383). A radiology report from that visit indicated that plaintiff presented with "bilateral lower extremity pain and swelling" as well as "shortness of breath." (Tr. 390). The radiologist, Kenneth D. Smith, M.D., found that "[t]he lungs are clear and well expanded," "[t]he heart and aorta are not enlarged," "[t]rachea is midline," "mild spondylosis is seen along the vertebral column," and that "bone density is borderline low." *Id.* Plaintiff was discharged home as stable. (Tr. 382).

On June 9, 2008, plaintiff returned to Great Mines Health Center complaining of leg swelling. (Tr. 397). Plaintiff was diagnosed with peripheral edema. (Tr. 398). Notes indicate a plan to prescribe Fluoxetine[16] and Doxepin for daily use. *Id.*

On September 2, 2008, plaintiff reported to Great Mines Health Center for a reevaluation of her sleeping issues. (Tr. 412). Nurse Cummings wrote that plaintiff had depression and insomnia. *Id.*

Plaintiff called Great Mines Health Center on October 31, 2008, for refills on Doxepin and Fluoxetine. (Tr. 395). The provider noted that plaintiff had an appointment scheduled for November 24, 2008. *Id.* And on November 24, 2008, plaintiff visited Great Mines Health Center complaining of severe depression and

---

[16] Fluoxetine, otherwise known as Prozac, is prescribed to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. https://medlineplus.gov/druginfo/meds/a689006.html (last visited May 30, 2017). Fluoxetine (Sarafem) is prescribed to relieve symptoms of premenstrual dysphoric disorder. *Id.*

insomnia. (Tr. 393). The visit note from that examination indicates that Nurse Cummings assessed that plaintiff had depression. *Id.* He noted a prescription plan that included Trazodone,[17] Citalopram,[18] and Flexeril. *Id.* A medication log from Great Mines Health Center lists a history of plaintiff's medications, which included Cymbalta,[19] Prometrium,[20] Lexapro,[21] Diclofenac,[22] Zantac,[23] Doxepin, and Prozac. (Tr. 392).

Plaintiff received an initial well woman exam on December 17, 2008. (Tr. 476). At that time plaintiff held prescriptions for Citalopram, Flexeril, and Trazadone. *Id.* Notes reflect that plaintiff's primary care physician treated her for osteoarthritis and depression. Also, the records show that plaintiff cared for her two-year old granddaughter for extended periods, frequently. *Id.* The notes mention that plaintiff was unemployed but was looking for work. *Id.*

Plaintiff underwent a disability examination on January 15, 2009, performed by Barry Burchett, M.D. (Tr. 401–07). Her chief complaint was "trouble with [her] legs." (Tr. 402). Dr. Burchett noted that plaintiff "reports a 1 1/2 –year history of constant swelling of the proximal medial tibial areas," and "describes pain in these

_____

[17] Trazodone treats depression. https://medlineplus.gov/druginfo/meds/a681038.html (last visited May 30, 2017).

[18] Citalopram is used to treat depression. https://medlineplus.gov/druginfo/meds/a699001.html (last visited May 30, 2017).

[19] Cymbalta is prescribed to treat generalized anxiety disorder and depression. https://medlineplus.gov/druginfo/meds/a604030.html (last visited May 30, 2017).

[20] Prometrium (progesterone) is prescribed for hormone replacement therapy in women who have gone through menopause. https://medlineplus.gov/druginfo/meds/a604017.html (last visited May 30, 2017).

[21] Lexapro is prescribed to treat generalized anxiety disorder and depression. https://medlineplus.gov/druginfo/meds/a603005.html (last visited May 30, 2017).

[22] Diclofenac can be an oral or topical treatment for relief of osteoarthritis or rheumatoid arthritis pain, tenderness, swelling, and stiffness. https://medlineplus.gov/druginfo/meds/a689002.html (last visited May 30, 2018&).

[23] Zantac (Ranitidine) treats ulcers, gastroesophageal reflux disease and other conditions with excess stomach acid. https://medlineplus.gov/druginfo/meds/a601106.html (last visited May 30, 2017).

areas when she stands for more than 15 minutes at a time or when she is walking up steps." *Id.* Plaintiff also communicated that the "pain diminishes with sitting down" and "even more with elevation of her feet." *Id.* Moreover, plaintiff "state[d] that she discussed this situation with her primary care physician about two months ago and he prescribed her some Flexeril, which has not been very helpful." *Id.* Plaintiff told Dr. Burchett that no x-rays had been performed. *Id.* Plaintiff also "describe[d] some intermittent numbness of the right anterior thigh with prolonged standing for more than approximately 15 minutes and doing such activities as washing dishes." *Id.* Plaintiff denied back pain and told Dr. Burchett that she had gained about forty pounds in the last three years. *Id.* Plaintiff held several prescriptions: Cyclobenzaprine,[24] Trazodone, Pravastatin, and Citalopram. (Tr. 403). Dr. Burchett noted that plaintiff had smoked two packs of cigarettes per day for fifteen years and that she denied the use of alcohol and drugs. *Id.* Dr. Burchett observed in his general notes that plaintiff "ambulates with a normal gait, which is not unsteady, lurching or unpredictable," and that she did not require a handheld assistive device. *Id.* Dr. Burchett also wrote that plaintiff "appears stable at station and comfortable in the supine and sitting positions." *Id.* Her "[a]ppearance, mood, orientation, and thinking seem[ed] appropriate." *Id.* And plaintiff's "recent and remote memory for medical events [was] good." *Id.* Dr. Burchett considered that plaintiff earned a GED and last worked at a gas station in September 2007. *Id.*

Next, Dr. Burchett conducted an examination of each of plaintiff's systems, including her HEENT (head, eyes, ears, nose, and throat), neck, chest, cardiovascular, abdomen, upper extremities, hands, cervical spine, and

---

[24] Cyclobenzaprine is prescribed to "relax muscles and relieve pain" caused by muscle injuries. https://medlineplus.gov/druginfo/meds/a682514.html (last visited May 31, 2017).

dorsolumbar spine. (Tr. 403–05). No abnormalities were noted. *Id.* Dr. Burchett also examined plaintiff's lower extremities, and wrote "[e]xamination of the legs reveals no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet," and "there is no calf tenderness, redness, warmth, cord sign or Homan's[stet] sign." (Tr. 404). Plaintiff complained of pain in the right knee when asked to squat. (Tr. 405). Dr. Burchett indicated that his clinical impression of plaintiff was neuralgia paresthetica and obesity. *Id.* He also summarized his findings as follows:

> "[t]he claimant is a 47-year-old female with some recurrent numbness of the right anterior thigh with prolonged standing. Neurological examination is unremarkable in the lower extremities. There is some symmetrical and bilateral fullness in the pretibial regions proximally but without any definite mass structures involved and probably consistent with her recent weight gain. There are no effusions of the knees. Range of motion of the knees was normal."
>
> *Id.*

On April 8, 2009, plaintiff reported to Great Mines Health Center complaining of sleep problems. (Tr. 416). Notes reveal that Nurse Cummings believed the sleeping issues were a symptom of menopause. *Id.*

A call-in sheet indicates that plaintiff phoned Great Mines Health Center on April 20, 2009, April 24, 2009, and May 26, 2009, May 29, 2009, and June 29, 2009, requesting samples of Zyprexa.[25] (Tr. 414–15). Plaintiff also asked why she was taking the medicine. (Tr. 415). Plaintiff was told that Zyprexa was prescribed to help her sleep problems and that she could stop taking it if she didn't need it. *Id.*

---

[25] Zyprexa (Olanzapine) is an antipsychotic medication prescribed for the symptoms of schizophrenia and bipolar disorder. https://medlineplus.gov/druginfo/meds/a601213.html (last visited May 31, 2017).

On November 30, 2009, records show that plaintiff called Great Mines Health Center to report that her prescribed sleep medication did not work; she requested a different prescription. (Tr. 411). Plaintiff called back the next day, on December 1, 2009, to ask whether the doctor could prescribe a less expensive medication than the Mirtazapine[26] prescription she received the previous day. (Tr. 410). A Great Mines Health Center medication log listed plaintiff's prior use of Cymbalta, Promethazine,[27] Lexapro, Diclofenac,[28] Zantac, Doxepin, Prozac, Trazodone, and Flexeril.[29] (Tr. 409). The log set out plaintiff's current medications as Citalopram, Pravastatin, Clonidine, Zyprexa, and Spironolactone. *Id.*

Plaintiff attended a well-woman exam on December 21, 2009. Records show plaintiff's medications as Trazadone and Celexa, as well as "BP med" prescribed for hot flashes. (Tr. 418). Plaintiff also stated that she had not been taking her cholesterol medication due to cost. *Id.* She also reported difficulties sleeping. *Id.* The physician indicated that plaintiff had abnormal lipids and obesity. *Id.* Records indicate that plaintiff smoked and that she had been counseled about healthy lifestyle choices. *Id.*

Plaintiff reported to Parkland Health Center on March 1, 2010, for right eye trauma. (Tr. 432). Notes indicate that a small hemorrhage in the sclera of the right eye. *Id.* Moderate pain was evidenced. (Tr. 435). Plaintiff also reported some headache symptoms at that time. *Id.*

---

[26] Mirtzapine is an antidepressant. https://medlineplus.gov/druginfo/meds/a697009.html (last visited on May 31, 2017).
[27] Promethazine is prescribed to treat the symptoms of allergic reactions, including allergic rhinitis, allergic conjunctivitis, and allergic skin reactions, among others. https://medlineplus.gov/druginfo/meds/a682284.html (last visited May 31, 2017).
[28] Diclofenac is prescribed to "relieve mild to moderate pain." https://medlineplus.gov/druginfo/meds/a689002.html (last visited May 31, 2017).
[29] These medications are crossed out on the log. (Tr. 409).

Plaintiff reported to Parkland Health Center on May 27, 2010, complaining of chest pain. (Tr. 438–39). The chest pain persisted for six hours prior to plaintiff's arrival at the hospital. (Tr. 439). The pain radiated down her arm. (Tr. 449). Plaintiff told Laong Garcia, M.D., that she had had headaches on and off for over a week. (Tr. 439). Dr. Garcia found no abnormalities upon examination – her eyes, ENT, neck, respiratory system, cardiovascular system, skin, neurological system, and psychiatric assessments were all normal. (Tr. 440). Dr. Garcia did note, however, plaintiff's obesity and bilateral edema. *Id.* Ultimately, Dr. Garcia diagnosed plaintiff with "chest pain, non cardiac." (Tr. 441). During the visit the hospital administered Nitroglycerin,[30] Aspirin, and a Toradol shot.[31] (Tr. 453). Plaintiff reported no headache or chest pain upon discharge. (Tr. 452).

On July 16, 2010, Dr. Burchett conducted an internal medicine assessment for plaintiff. (Tr. 463–69). Plaintiff's chief complaints included "trouble with [her] legs and [her] eyes." (Tr. 464). Dr. Burchett summarized plaintiff's history as follows:

> [Plaintiff] reports problems with both legs, right worse than left for the past 2 years. She denies any history of injury to the leg. She complains of localized swelling in the proximal anteromedial tibial areas. She also complains of pain in th[ese] areas if she walks more than approximately 1 block, especially if she walks up steps. She states that she has discussed this with her PMD, but she has never had any particular evaluation or specific treatment for this. She further complains that for the past 4 months, she has had recurrent swelling of her feet bilaterally with prolonged standing.

> *Id.*

---

[30] Nitroglycerin is used to treat episodes of angina (chest pain). https://medlineplus.gov/druginfo/meds/a601086.html (last visited May 31, 2017).
[31] Toradol (Ketorolac) "is used to relieve moderately severe pain in adults, usually after surgery. Ketorolac is in a class of medications called NSAIDS." https://medlineplus.gov/druginfo/meds/a614011.html (last visited May 31, 2017).

After briefly summarizing plaintiff's social history as a smoker, non-drug user, and non-alcoholic, with a GED, Dr. Burchett noted that plaintiff last worked at Walmart in June 2010. (Tr. 465). With regard to her vision, plaintiff told Dr. Burchett that she had not received an ophthalmological examination in about three years, and that she had some difficulties with night vision and haze around lights. (Tr.464).

Plaintiff's medications at this time included Ranitidine, Clonidine, Alprazolam, Spironolactone, and Pravastatin. (Tr. 465). Dr. Burchett found that plaintiff had adequate hearing, as well as good recent and remote memory for medical events. *Id.* Additionally, plaintiff's occasional epigastric pain was "consistent with GERD." *Id.* Dr. Burchett found no abnormalities with regard to plaintiff's HEENT, neck, abdomen, hands, cervical spine, dorsolumbar spine, and upper extremities. (Tr. 466).

Dr. Burchett wrote that plaintiff complained of morning cough, as well as wheezing in hot weather and with prolonged walking. (Tr. 465). He added that although she denied issues with chest pain, plaintiff had gone to the emergency room on June 27, 2010, with chest pains. *Id.* He noted that plaintiff was diagnosed with anxiety during the emergency room visit. *Id.* The respiratory examination revealed "moderate bilateral wheezing" and diminished breath sounds. (Tr. 466–67).

Dr. Burchett wrote that plaintiff ambulated with a normal gait, which was not unsteady, lurching, or unpredictable. (Tr. 465). He further observed that she did not need a handheld assistive device for walking. *Id.* Plaintiff "appear[ed] stable at

station and comfortable in the supine and sitting positions." *Id.* Dr. Burchett examined plaintiff's lower extremities. He found that there was no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet. (Tr. 466). He also concluded that there was no calf tenderness, redness, warmth, cord sign or Homan's sign. *Id.* He stated that "[t]here may be some vague swelling bilaterally in a symmetrical fashion in the medial proximal anterior tibial areas, although this is not certain." *Id.* Normal neurological findings were noted, though Dr. Burchett observed that plaintiff placed her hand on the table to regain the upright position during a squat. (Tr. 467). Dr. Burchett described plaintiff's leg pain as follows:

> The claimant described some vague numbness and pain bilaterally and symmetrically in the anterior medial proximal tibias. There may be some slight swelling and dislocation, although I cannot really say for sure. There is no significant tenderness. There is full range of motion of her knees. She walked without a limp. She placed her hand on the table top to regain the upright position after performing a squat.
>
> *Id.*

Dr. Burchett's diagnoses were (1) possible cataracts, (2) unexplained bilateral leg pain, (3) GERD, mild, (4) possible anxiety disorder by history, and (5) emphysema/ COPD. *Id.*

On August 24, 2010, plaintiff met with Jason T. Street, O.D., for a comprehensive eye examination. (Tr. 471). Dr. Street noted that plaintiff's "chief complaint was blurred vision and she noted she was exposed to chlorine gas in a chemical accident a couple of years ago." *Id.* Plaintiff also described a family history of Fuch's Dystrophy. Dr. Street summarized plaintiff's health conditions as GERD,

emphysema, and migraine headaches. *Id.* And he listed her prescription medications as Pravastatin, Spironolactone, Clonidine, Ranitidine, and Alprazolam. *Id.* He concluded that plaintiff had the "beginning signs" of Fuch's Dystrophy, but is "asymptomatic at this time." *Id.* He also found that she had cataracts that were not "clinically significant at this time," and that any cysts were simply cosmetic issues. *Id.* He stated that glasses would allow her to "function much better." *Id.* Finally, Dr. Street wrote that with glasses to correct her refractive error, plaintiff would not have any limitation on her ability to perform work-related functions, based on her ability to see correctly. (Tr. 472). He stated that her ability to function could change if her Fuch's Dystrophy progressed. *Id.*

Plaintiff visited Great Mines Health Center on September 8, 2010, for a follow-up appointment and medication refills. (Tr. 487). Her medications included Clonidine, Pravastatin, Ranitidine, and Spironolactone. (Tr. 488). Nona Mungle, APRN, described plaintiff as a "well-nourished, well-developed female in no acute distress," who is "awake and alert." *Id.* She described plaintiff's gait as "normal." *Id.* Nurse Mungle also studied plaintiff's psychological status, observing that plaintiff had "appropriate judgment," "good insight," "proper orientation," intact recent and remote memory, "euthymic" mood, and "appropriate affection." *Id.* Nurse Mungle noted several of plaintiff's complaints – she had hot flashes and sleep disturbance, but no loss of appetite, fatigue, chills, or headaches. *Id.* Loss or blurring of vision, as well as indigestion and heartburn were also noted. *Id.* Diagnoses included menopausal symptoms, insomnia, mixed hyperlipidemia, and dyspepsia and other disorders of function of the stomach. (Tr. 488–89). The prescriptions remained the same, except that Alprazolam was substituted for Ranitidine. (Tr. 489).

Plaintiff had her annual well woman exam on January 4, 2011. (Tr. 474). Her listed medications at that time included Pravastatin, Spironolactone, Clonidine, Alprazolam, and Ranitidine. *Id.*

Great Mines Health Center records from January 7, 2011, summarize plaintiff's medical issues on that date: (1) symptomatic menopausal or female climacteric states, (2) insomnia unspecified, (3) mixed hyperlipidemia, and (4) dyspepsia and other specific disorders of function of stomach. (Tr. 485). Her medication list included Clonidine, Pravastatin, Ranitidine, and Spironolactone. *Id.*

Plaintiff returned to Great Mines Health Center on January 19, 2011, to refill medications and to review cholesterol level test results. (Tr. 515). Her problem list remained the same as that from her previous visit. (Tr. 515–16). Medications on that date included Clonidine, Pravastatin, and Spironolactone. (Tr. 516). Plaintiff reported symptoms of headaches and sleep disturbance, nausea, "change in sleep pattern, depression, and moodiness." *Id.* Marianne Klemm, M.D., stated that plaintiff presented with "no acute distress," and was "awake and alert," with "good insight," proper orientation, intact memory, appropriate affection, and "euthymic" mood. *Id.* Dr. Klemm's diagnoses included (1) symptomatic menopausal or female climacteric states, (2) insomnia unspecified, and (3) anxiety state unspecified. *Id.* Dr. Klemm prescribed Celexa, Restoril,[32] and Xanax, and scheduled a follow-up appointment. (Tr. 516–17).

Plaintiff underwent an internal medicine disability examination on March 10, 2011. (Tr. 493–98). Plaintiff's chief complaint was that her "knees and feet swell and [her] knees grind." (Tr. 493). Plaintiff told Dr. Burchett that her knees and feet

---

[32] Restoril (Temazepam) is a benzodiazepine used for the short-term treatment of insomnia. https://medlineplus.gov/druginfo/meds/a684003.html (last visited May 31, 2017).

swell when she stands for four to five hours at a time at work, without rest. *Id.* Dr. Burchett noted that plaintiff "complains of crepitus with range of motion of both knees, although [she] does not seem to have much pain associated with this." *Id.* Her medications at the time of examination included Clonidine, Spironolactone, Pravastatin, Ranitidine, Alprazolam, and Citalopram. *Id.*

Dr. Burchett's notes summarized plaintiff's social history, education, and occupational history. (Tr. 494). She last worked at Wal-Mart in April 2010. *Id.* Dr. Burchett wrote that plaintiff had smoked a pack of cigarettes every day for the last fifteen years, and that she denied the use of alcohol or drugs. *Id.* He noted that plaintiff was seen in the emergency room the previous year for anxiety-related chest pain. *Id.* Generally, plaintiff's hearing, recent and remote memory, "appearance, mood, orientation, and thinking" seemed normal and appropriate. *Id.* He described plaintiff's abdomen as "moderately obese." (Tr. 495).

Dr. Burchett reported that plaintiff's walking was normal, and not "unsteady, lurching, or unpredictable." (Tr. 494). She did not require a handheld assistive device for ambulation, and she appeared stable and comfortable in the supine and sitting positions. *Id.* An "[e]xamination of the legs reveal[ed] no tenderness, redness, warmth, swelling, fluid, laxity of the knees, ankles, or feet," as well as "no calf tenderness, redness, warmth, cord sings or Homan['s] sign." (Tr. 495). However, he found "mild bilateral crepitus of the knees with range of motion." *Id.* He also added that, upon performing a single full squat, plaintiff needed to place her hand on a table for assistance, and that she complained of pain in her knees. (Tr. 495–96). His impression was that plaintiff possibly had osteoarthritis of the knees and hypertension. (Tr. 496). In his summary narrative he wrote that plaintiff

arrived "with complaints of swelling of the lower extremities with dependency, but no swelling noted today," and that "there is full passive range of motion of all joints," as well as "mild crepitus noted in the knees," although she walked without a limp. *Id.*

On March 31, 2011, plaintiff received a psychiatric review from Gretchen Brandhorst, Psy.D. (Tr. 499–509). Dr. Brandhorst's assessment, covering the period from September 3, 2010, to the date of the examination concluded that plaintiff had non-severe impairments. (Tr. 499). Specifically, she determined that plaintiff had depression. (Tr. 502). She did not find that plaintiff had anxiety. *Id.*

Dr. Brandhorst evaluated the degree of limitation that resulted from plaintiff's depression. (Tr. 507). She concluded that plaintiff had (1) mild restriction of activities of daily living, (2) mild difficulties in maintaining social functioning, (3) mild difficulties in maintaining concentration, persistence, or pace, and (4) no repeated episodes of decompensation of extended duration. *Id.* No "C" criteria were found. (Tr. 508). Dr. Brandhorst's narrative provided the following findings:

> Claimant lists Alprazolam as current medication. In the medical evidence, mental evaluations are rated as normal or indicate[] sleep disturbance related to menopausal symptoms. There is [a history] of [diagnoses] of [d]epression in 2005. There is no evidence of therapy for depression nor ha[ve] there been any hospitalizations for such. In her ADL's, the claimant implies she has trouble with concentration and does not feel like doing anything except laying around. She also indicates she gets out once or twice a week, can go out alone and shops twice per month for two hours at a time. Claimant's statements are considered only partially credible as they are not consistent with medical evidence and there is lack of complaint of increasing symptoms. It is reasonable to conclude her impairment [i]s nonsevere.

> (Tr. 509).

Medical records from May 3, 2011, show that plaintiff presented to Great Mines Health Center for a follow-up appointment regarding her leg pain and medication refills. (Tr. 512–14). A review of symptoms included sleep disturbance, indigestion or heartburn (treated by Ranitidine), and joint pain in both legs. (Tr. 513). Plaintiff also complained of bruising and wanted to discuss her cholesterol medication. (Tr. 512). The attending physician, Marianne Klemm, M.D., noted that plaintiff "thinks the leg pain may be due to cholesterol" and also relayed that "the problem minimally improved since the last visit." *Id.* Other notes indicate that plaintiff described the pain as "bilateral," and moderate in intensity. *Id.* Plaintiff told Dr. Klemm that the symptoms were most pronounced when she was active or inactive; the pain purportedly affected her daily activities. *Id.* An examination of plaintiff's musculoskeletal system showed that plaintiff's gait was "slow and deliberate." (Tr. 513). Her range of motion, lower extremities, palpation, and joint stability all appeared normal. *Id.* Currently prescribed medications included Clonidine, Spironolactone, and Xanax. *Id.* Her general appearance was described as "well-nourished" and "well-developed," as well as "awake and alert." *Id.* A psychiatric analysis showed plaintiff had "appropriate judgment," "good insight," "proper orientation to time, place and person," intact recent and remote memory, "bland" mood, and "appropriate affect." *Id.* Dr. Klemm concluded that plaintiff had lower leg joint pain and mixed hyperlipidemia. *Id.* Dr. Klemm prescribed a refill of Xanax. *Id.*

On August 15, 2011, plaintiff presented to Great Mines Health Center for refills of Celexa and Xanax, as well as for a knot on her arm. (Tr. 511). Records

indicate plaintiff had a mass on her upper left arm, as well as "anxiety/depression." *Id.* Plaintiff received prescriptions for Celexa and Xanax. *Id.*

On November 17, 2011, plaintiff visited Great Mines Health Center for a Xanax refill and an evaluation of her anxiety. (Tr. 510). She conveyed that her current medication was "not strong enough." *Id.* An analysis showed that her affect was normal and that the tobacco abuse could cause anxiety. *Id.* Plaintiff was diagnosed with anxiety and tobacco abuse syndrome. *Id.* Plaintiff's prescription for Xanax was renewed. *Id.*

Plaintiff received a psychological evaluation by Thomas J. Spencer, Psy.D. on February 13, 2012. (Tr. 523–31). Plaintiff's chief complaints included leg swelling, depression, anxiety, and insomnia. (Tr. 523). Plaintiff described her anxiety and depression. *Id.* She told Dr. Spencer that she suffered with these conditions for about two years. *Id.* She further described her unhappiness, unwillingness to leave the home, and anxiety and racing heart when going into public. *Id.* Consequently, she said, her husband did the shopping or provided accompaniment when she left the home. *Id.* She also experienced panic sensations – breaking out in a cold sweat and shortness of breath. (Tr. 524). Plaintiff reported "periodic anxiety" when in the home. (Tr. 523). She purportedly struggled to concentrate or finish tasks, making her feel worthless. (Tr. 523–24). Plaintiff told Dr. Spencer she was depressed "all the time," but denied suicidal ideation and did "not necessarily feel hopeless or helpless." (Tr. 524). Depressive episodes lasted several days, and plaintiff reported a loss of interest in activities she formerly enjoyed. *Id.* Plaintiff did not convey any mania or psychosis, and had no history of inpatient treatment. *Id.*

Plaintiff also discussed issues with her appetite and sleep with Dr. Spencer. She stated that she "often does not feel hungry." *Id.* And with regard to her sleep, she woke up repeatedly throughout the night, and only slept for about four hours. Because of that, she was tired by early afternoon. *Id.* Still, plaintiff purportedly completed her activities of daily living and did housework. *Id.* Plaintiff reported doubts with regard to the efficacy of her current medications and treatment. *Id.* She told Dr. Spencer that she had issues with her legs and a lump on her arm that her physician did not take seriously. *Id.* And although she had current prescriptions for Xanax, Celexa, Pravastatin, Spironolactone, and Clonidine, she doubted the functioning of Celexa. *Id.* She noted that Xanax made her feel "calmer." *Id.*

Dr. Spencer conducted a mental status exam. He found that plaintiff presented with no impairment in grooming or hygiene, fair eye contact, raspy speech, and without physical distress. (Tr. 525). He noted that she ambulated "without assistance and with no noticeable difficulty." *Id.* He also described her as "cooperative," and a "decent historian." *Id.* Moreover, plaintiff's insight and judgment also seemed normal. *Id.* Dr. Spencer wrote that plaintiff "presented with a neutral affect," and she described her mood as "okay." *Id.* Dr. Spencer further observed that plaintiff was alert and oriented, did not respond to internal stimuli, did not demonstrate delusional beliefs, and had intact and relevant flow of thought. *Id.* He opined that plaintiff appeared to be of average intelligence, and demonstrated knowledge of social norms. *Id.* According to Dr. Spencer, plaintiff also did not appear to have any issues with long-term memory. *Id.* In a series of tasks (recalling objects, serial threes, six digits forward and three backward, identifying newsworthy events, and spelling "world" forward and backward),

plaintiff did not struggle, though she took an excessive amount of time to complete serial threes. *Id.* Dr. Spencer diagnosed plaintiff with adjustment disorder – and specifically chronic depression and anxiety. (Tr. 526). He surmised that she had a GAF of 55 to 60. *Id.*

Dr. Spencer then assessed plaintiff's ability to do work-related activities. (Tr. 529). He concluded that she had no impairment in her abilities to understand and remember simple instructions, carry out simple instructions, or make judgments on simple work-related instructions. *Id.* She had mild impairment in her abilities to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. *Id.* She also had mild impairments in her abilities to appropriately interact with the public, supervisors, or co-workers, and respond appropriately with work situations and changes in a routine work setting. (Tr. 530).

On February 16, 2012, plaintiff reported to Great Mines Health Center for prescription refills and to discuss bone density. (Tr. 537). Notes from that visit indicate that plaintiff presented with no new complaints but she had a slight cough. *Id.* No cyanosis or edema was noted for her extremities, though her ambulation was described as slow and deliberate. *Id.* Other observations were normal, but plaintiff appeared "older than [her] stated age." *Id.* Anxiety, depression, tobacco use syndrome, and hyperlipidemia were all listed as conditions. *Id.* Her medications included Flexeril, Celexa, Spironolactone, Clonidine, Pravastatin, Xanax, and Ranitidine. *Id.*

Lauretta V. Walker, Ph. D., conducted a psychological evaluation of plaintiff on August 14, 2012. (Tr. 546–553). Dr. Walker described plaintiff as unusually

dressed, but also cooperative, reliable, and early for her appointment. (Tr. 546).

After reviewing plaintiff's personal and professional history, Dr. Walker performed a mental status exam. (Tr. 547). Plaintiff's affect and mood were described as "euthymic." *Id.* Her speech was normal and her thoughts were "coherent and goal directed." (Tr. 547–48). Dr. Walker noted that plaintiff walked slowly but otherwise seemed fine. (Tr. 548).

Plaintiff told Dr. Walker that she wakes up every hour and only slept three or four hours each night. *Id.* Plaintiff stated that sleep medications did not help; she also mentioned that she suffered from nightmares from traumatic experiences. *Id.* Plaintiff reported that she ate only once a day and that she had lost 54 pounds over three years. *Id.* Plaintiff described her mood as mostly depressed, and rated her depression as a 3 out of 10 (on a scale where 1 is extremely depressed). *Id.* She reported experiencing anxiety attacks that came without warning.  She related an incident in which that she went to the emergency room during a panic attack because she mistook it for a heart attack. *Id.* Plaintiff also stated that she had never attempted  suicide. *Id.*

Plaintiff said that she did household chores, but she did them slowly and required breaks. *Id.* She also expressed interest in television and movies; she stated that she tried to make quilts, do crafts, and decorate cakes. *Id.* Although plaintiff said she did not have many friends, she spoke with her daughters and took care of a small dog. *Id.*

Dr. Walker described plaintiff as "oriented," with a "good fund of basic information." *Id.* She concluded that plaintiff was of average intelligence, but with "occasional problems with anxiety interfering." (Tr. 548). Dr. Walker diagnosed

plaintiff with a pain disorder associated with psychological factors, mild, recurrent major depression, pain and swelling in the legs, and insomnia. (Tr. 548–49). Plaintiff had a GAF of 57. (Tr. 549). In her narrative, Dr. Walker noted the scarcity of current medical information. *Id.* She also resolved that "[i]f there are medical symptoms they tend to make psychological ones worse." *Id.* Dr. Walker determined that plaintiff had symptoms of long-term, mild depression, and that plaintiff required effective medications for insomnia and pain, as those conditions greatly interfere with functioning. *Id.* Dr. Walker further wrote:

> [Plaintiff] is able to understand and follow instructions and make decisions with only mild impairment most of the time. The follow through may be impaired to some degree by a physical condition. There is moderate to severe impairment in her ability to adapt to changing situations which seems to be largely related to her physical pains. She tends to isolate herself but from her reports there is no significant impairment in her ability to work with others and with bosses.

*Id.*

Dr. Walker completed a medical source statement evaluating plaintiff's ability to do work-related activities. (Tr. 550–52). According to this assessment, plaintiff's ability to understand and remember simple instructions and to make judgments on simple work-related decisions was mildly affected by her impairments. (Tr. 550). Plaintiff's abilities to make judgments on simple work-related decisions, understand and remember complex instructions, and make judgments on complex work-related decisions were unaffected by her impairments. *Id.* Dr. Walker believed that plaintiff's marked difficulty in the ability to carry out simple instructions was due to her physical pain. *Id.* Dr. Walker explained that plaintiff's ability to interact appropriately with the public, supervisors, and co-workers was mildly affected by

her impairments. *Id.* Plaintiff's impairments had a marked affect on her ability to respond appropriately to usual work situations and to changes in a routine work setting. *Id.* Dr. Walker opined that plaintiff's impairment did not affect other capabilities. *Id.*

On July 29, 2013, plaintiff reported to the Great Mines Health Center complaining of knee pain, anxiety, and depression. (Tr. 561). Plaintiff requested medication refills. *Id.* Notes state that plaintiff had not "been here in a while because of financial reasons." Plaintiff also described herself as irritable and attributed worsened irritability to her sleep issues. *Id.* Plaintiff stated that Celexa had not helped her condition but that Xanax had been somewhat effective. *Id.* Plaintiff's reported conditions included anxiety and depression leading to irritability, insomnia, hyperlipidemia, GERD, and hot flashes. *Id.* And medications included Clonidine, Spironolactone, Pravastatin, Zantac, Xanax, and Cymbalta. *Id.*

Plaintiff presented at Mercy Hospital on January 29, 2014, complaining of leg and knee pain. (Tr. 562). She told physicians that she had experienced this pain for several years and that her primary care physician "won't do anything about it." (Tr. 563). She described her pain as a 9 out of 10 in severity, and noted that Tylenol and Aleve did not provide relief. *Id.* Her pain had purportedly worsened over the preceding three to four days. *Id.* Records indicate that plaintiff had "pain with movement and palpation of bilateral knees," but that no swelling, bruising, or redness was observed. (Tr. 564). Rachel Jefferson, M.D., determined that plaintiff suffered from arthritis, and prescribed hydrocodone. (Tr. 565). Plaintiff was advised to follow up with an orthopedist. *Id.*

Robert D. Lewis, M.D., assessed plaintiff's claims of visual disability on February 14, 2014. (Tr. 556–60). After his examination, Dr. Lewis concluded that plaintiff did not have a visual impairment. (Tr. 557). He noted that she had minimal corneal endothelial dystrophy with no corneal thickening, moderate hyperopia that was correctable with glasses, and minimal cataracts. (Tr. 558). He added that plaintiff appeared to "function well," but that the "corneal problem may worsen over time." (Tr. 560).

Plaintiff presented at Mercy Hospital on August 20, 2014, for a disability examination. (Tr. 566). Mel T. Moore, M.D., ordered three image views of plaintiff's right knee, attendant to plaintiff's history of pain and stiffness with swelling below the patella. *Id.* Dr. Moore opined that "the patella is well seated," and "the joint space heights are well maintained." *Id.* He also observed no fracture, dislocation, destruction, lesion of bone, or joint effusion. *Id.* Dr. Moore noted "some soft tissue swelling anterior to the anterior tibial tuberosity." *Id.* Dr. Moore made the same observations with regard to plaintiff's left knee, despite plaintiff's claim of a recent injury to that knee. (Tr. 567).

On August 25, 2014, Charles Mannis, M.D., conducted a disability determination examination. (Tr. 574). He reviewed plaintiff's complaints of knee and leg pain, hip pain, and elbow pain. *Id.* Plaintiff told Dr. Mannis that she had longstanding knee problems and that she had torn her right ACL one year prior to examination. *Id.* Dr. Mannis noted that "it is not apparent how the diagnosis was arrived at," as plaintiff did not receive an MRI. *Id.* Also, he noted that she used only a splint to treat the alleged ACL tear. *Id.* Additionally, plaintiff told Dr. Mannis that

she suffered from pain and swelling in her legs prior to this injury. *Id.* Heat or ice did not ease that pain; only elevating her legs and rest mitigated her symptoms. *Id.*

Plaintiff also reported a "burning feeling in her knees and hips." (Tr. 575). She added that her lower legs swelled and her left foot tingled (from prolonged sitting). *Id.* Plaintiff stated that she could not squat, bend, or walk up or down stairs. *Id.* She also had to sit down frequently to elevate her legs. *Id.* Plaintiff told Dr. Mannis that she could walk for about fifty feet, sit for about thirty minutes, and stand for about thirty minutes. *Id.* Dr. Mannis observed that plaintiff had "a slow gait pattern, but there is no distinct limp noted." *Id.* He also noticed that plaintiff used a cane, "which she states helps a little bit." *Id.*

In his orthopedic and neurological exam notes, Dr. Mannis provided specifics on plaintiff's lower extremities. *Id.* He stated that "[t]here is no swelling in the pretibial area or either ankle," and the ankles had full motion. (Tr. 575). He further described that "[e]xamination of the knees reveals swelling below the knees in the area of the pes anserine bursa bilaterally." *Id.* Dr. Mannis observed "tenderness over the pes anserine bursa bilaterally" and "medial joint line tenderness on the left side." *Id.* He found that plaintiff had "some very slight restriction of left knee motion" due to pain. *Id.* Muscle tone was "slightly diminished bilaterally." *Id.* Finally, he found no laxity of the knees or unusual findings of patellofemoral mechanics. *Id.* Dr. Mannis concluded that there was "no measurable swelling" or "palpable effusion" of either knee. (Tr. 576).

Dr. Mannis detected "tenderness to palpation over the trochanteric bursa" for the right hip, but no restriction of motion. *Id.* Plaintiff's left hip showed no abnormalities. *Id.* Dr. Mannis's clinical impressions included (1) probable pes

anserine bursitis, degenerative arthritis, or meniscal pathology of each knee, and (2) possible trochanteric bursitis of the right hip. *Id.*

Dr. Mannis summarized plaintiff's ability to do work-related activities.[33] (Tr. 579). He found she could occasionally lift up to ten pounds, but could never lift more than that. *Id.* He related that she could occasionally carry up to ten pounds, but could never carry heavier objects. *Id.* Next, He believed that plaintiff could sit for thirty minutes at a time without interruption, stand for thirty minutes at a time without interruption, and walk for fifteen minutes at a time without interruption. (Tr. 580). In an eight-hour workday, plaintiff could sit for five hours total, stand for two hours total, and walk for one hour total. *Id.* Dr. Mannis stated that it was "undetermined" whether plaintiff required a cane to walk. *Id.*

Additionally, Dr. Mannis stated that plaintiff was able to frequently use each of her hands for reaching (overhead and otherwise), handling, fingering, feeling, pushing, and pulling. (Tr. 581). She could occasionally operate foot controls with each foot. *Id.* Dr. Mannis found that plaintiff was never able to (1) climb stairs or ramps, (2) climb ladders or scaffolds, (3) balance, (4) kneel, or (5) crawl. (Tr. 582). He opined that she could occasionally stoop or crouch. *Id.* He did not evaluate plaintiff's hearing or vision. *Id.* Dr. Mannis further noted that plaintiff could never tolerate exposure to unprotected heights. (Tr. 583) But she could tolerate moving mechanical parts and operating a motor vehicle. *Id.* Finally, he determined that plaintiff could (1) perform activities like shopping, (2) travel without a companion for assistance, (3) ambulate without using a wheelchair, walker, or two

---

[33] The form defined "regular and continuous basis" as "8 hours a day, for 5 days a week, or an equivalent work schedule." It defined "occasionally" as "very little to one-third of the time." It defined "frequently" as "one-third to two-thirds of the time." The statement defined "continuously" as "more than two-thirds of the time." (Tr. 579).

canes or crutches, (4) walk a block at a reasonable pace on rough or uneven surface, (5) use standard public transportation, (6) climb a few steps at a reasonable pace with the use of a single hand rail, (7) prepare a simple meal and feed herself, (8) care for her personal hygiene, and (9) sort, handle, or use paper and files. (Tr. 584).

### III.  The ALJ's Decision

On December 2, 2014, the ALJ issued a decision containing the following findings with respect to plaintiff's application for disability benefits pursuant to Social Security Act § 1614(a)(3)(A), § 216(i), and § 223(d):

1. Plaintiff met the insured status requirements of the Social Security Act through March 31, 2012.

2. Plaintiff did not engage in substantial gainful activity since her alleged onset date of December 1, 2007. 20 C.F.R. § 404.1571 *et seq.*; 20 C.F.R. § 416.971 *et seq.*

3. Plaintiff had the following severe impairments: peripheral edema, obesity, pain disorder associated with psychological factors, and major depressive disorder. 20 C.F.R. §§ 404.1520(c), 416.920(c).

4. Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525. 404.1526, 416.920(d), 416.925, 416.926.

5. Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she was unable to climb ladders, ropes, or scaffolding, kneel, crouch, and crawl, but she could occasionally climb ramps or stairs. The plaintiff was unable to operate any foot control operations. The plaintiff needed to avoid all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery. The plaintiff was limited to occupations that involve only simple, routine, and repetitive tasks in a low stress job defined as requiring only occasional decision making and only occasional changes in the work setting with no contact with the public and only casual and infrequent contact with co-workers.

6.      Plaintiff was unable to perform any past relevant work. 20 C.F.R. §§ 404.165, 416.965.

7.      Plaintiff was born on October 3, 1961, and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. Plaintiff subsequently changed age category to closely approaching advanced age. 20 C.F.R. §§ 404.1563, 416.963.

8.      Plaintiff had at least a high school education and was able to communicate in English. 20 C.F.R. §§ 404.1564, 416.964.

9.      Transferability of job skills would not be an issue in this case because the claimant's past relevant work is unskilled. 20 C.F.R. §§ 404.1568, 416.968.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. 20 C.F.R. §§ 404.1569, 416.969.

11.     The claimant had not been under a disability, as defined in the Social Security Act from December 1, 2007, through the date of the decision. 20 C.F.R. §§ 404.1520(g), 416.920(g).

        (Tr. 53–66).

## IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "'Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (*quoting Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm

the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." <u>Moore</u>, 572 F.3d at 523 (<u>citing</u> 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant

evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (*quoting Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059–60 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, by comparing the RFC with the physical and mental demands of a claimant's past work. 20 C.F.R. § 404.1520(f). The burden at step four remains with the claimant to prove her RFC and establish that he cannot return to her past

relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); s*ee also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. <u>Discussion</u>

Plaintiff claims that the ALJ erred (1) in formulating plaintiff's RFC due to improper weighing of expert opinions and improper assessment of plaintiff's credibility, and (2) in establishing that plaintiff could perform a significant number of jobs in the national economy, as a result of flawed hypothetical questions posed to the vocational expert. [Doc. # 13].

## A. <u>RFC Determination</u>

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (*quoting Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)).

"'However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant.'" *Martise*, 641 F.3d at 932 (*quoting Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946).

To formulate plaintiff's RFC in this case the ALJ considered all of plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. 58). The ALJ also considered opinion evidence. *Id.* The ALJ then studied the intensity, persistence, and limiting effects of all symptoms to determine how they inhibited plaintiff's functioning. (Tr. 59). He concluded that plaintiff could perform light work as defined under 20 C.F.R 404.1567(b) and 416.967(b), except that she could not climb ladders, ropes, or scaffolding, kneel, crouch, or crawl. (Tr. 58). But, she could occasionally climb ramps or stairs. *Id.* The ALJ also found that plaintiff could not operate any foot control operations, and should avoid all operational control of moving machinery, working at unprotected heights, and using hazardous machinery. *Id.* With regard to her psychological limitations, plaintiff was limited to occupations that involved only simple, routine, and repetitive tasks in a low stress job. *Id.* Such a job would entail only occasional decision-making and changes in the work setting. *Id.* Moreover, plaintiff would have no contact with the public and only casual and infrequent contact with coworkers. *Id.*

Plaintiff argues that this RFC did not accurately capture her limitations because the ALJ (1) improperly weighed expert medical opinions, and (2) incorrectly found plaintiff not credible.

## Opinion of Dr. Mannis

Plaintiff argues that, although the ALJ placed great weight on the opinion of Dr. Mannis, the RFC did not reflect all the limitations in the physician's opinion. [Doc. #13 at 11–12]. Therefore, plaintiff claims that the RFC was inaccurate. *Id.* Plaintiff specifically contends that the finding that she has the RFC to do light exertional work[34], which requires the capability to stand or walk up to six hours in an eight-hour workday under 20 C.F.R. 404.1567(b) and 416.967(b), is inconsistent with the limitations Dr. Mannis described. [Doc. #13 at 8]. Moreover, she states that the ALJ did not explain the discrepancies between his conclusions and those of Dr. Mannis. *Id.*

"As a general matter, the report of a consulting physician who examined [a] claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (internal quotation marks omitted) (quoting *Lanning v. Heckler*, 777 F.2d 1316, 1318 (8th Cir. 1985)). And "[i]n deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." *Wagner v. Astrue*, 499

---

[34] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

F.3d 842, 848 (8th Cir. 2007). "The hearing examiner need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." *Id.* at 849 (internal quotation marks, formatting, and citations omitted).

Here, the ALJ placed great evidentiary weight on Dr. Mannis's consultative opinion. (Tr. 63). In so doing, the ALJ noted that Dr. Mannis's opinion (that claimant was "limited to less than the full range of light exertional work") was "reasonably well supported by the objective record." *Id.* Further, the ALJ determined that Dr. Mannis's examination of plaintiff's hips, legs, and knees was "largely unremarkable, and certainly nonsupportive of greater limitation than found" herein." (Tr. 61). The ALJ summarized Dr. Mannis's findings – noting that an examination of claimant's hips revealed no abnormalities on the left side and only "some subjective tenderness to palpation over the trochanteric bursa" on the right side. *Id.* Dr. Mannis observed no restriction of movement. *Id.* With regard to plaintiff's knees, the ALJ considered Dr. Mannis's findings that there was some swelling and subjective tenderness over the pes anserine bursa, as well as some medial joint line tenderness on the left knee. *Id.* The ALJ placed particular emphasis on Dr. Mannis's explication that plaintiff had a only a "very slight restriction in range" for her left knee, no restriction in range for the right knee, no laxity of either knee, no palpable effusion of either knee, only slight diminishment in strength of the knees, and normal graded and symmetrical reflexes about the knees at 2+. *Id.* And finally, the ALJ considered that Dr. Mannis did not detect any swelling of plaintiff's ankles; plaintiff's ankles had full range of motion. *Id.* Dr. Mannis continued the diagnoses that plaintiff had probable pes anserine bursitis versus

degenerative arthritis and/or meniscal pathology at each knee, as well as possible trochanteric bursitis of the right hip. *Id.*

The Court agrees that the RFC does not fully capture *all* of the limitations provided in Dr. Mannis's opinion. Still, the ALJ properly considered Dr. Mannis's opinion in determining plaintiff's RFC. The ALJ accorded Dr. Mannis's opinion "great evidentiary weight," not controlling weight. *See Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012). This is because the ALJ found that Dr. Mannis's opinion was "*reasonably* well supported by the objective record." (Tr. 63). The ALJ indicated that plaintiff's subjective complaints of pain were not fully credible – and that Dr. Mannis relied on these subjective complaints in his analysis. (Tr. 61). The physical exam itself, however, "was largely unremarkable." *Id.*; *see Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) (noting that the plaintiff failed to "recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible"). The RFC must only include those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001).

Additionally, in weighing Dr. Mannis's opinion, and the limitations contained therein, the ALJ considered other medical records. Specifically, he discussed plaintiff's visits to Great Mines Health Center in March 2007 and June 2008, as well as Parkland Health Center records from March 2008. (Tr. 59). Plaintiff presented to these visits complaining of painful lower extremity swelling, however, the results of the examinations were unremarkable. *Id.* Moreover, the ALJ discussed plaintiff's visit to Mercy Hospital on July 29, 2014, when physicians found "no evidence for swelling, bruising, or redness" of the legs, knees, and hips, and no indications of

"specific reduction in range or associated deficits of motor, sensory or reflect functioning." *Id.* The ALJ added that radiographic imaging on August 20, 2014, was largely unremarkable and "[t]he imaging of the claimant's right knee was read to demonstrate only pre-tibial soft tissue swelling, and the imaging of the claimant's left knee [was] read to show no evidence of fracture or significant degenerative changes." (Tr. 59–60).

The ALJ also considered Dr. Mannis's opinion in conjunction with other consultative examinations in January 2009, July 2010, and March 2011 by Dr. Burchett. (Tr. 60–61). During the January 2009 visit, plaintiff reported a history of constant swelling of the proximal medial tibial areas, pain when standing in excess of fifteen minutes at a time or climbing stairs, and intermittent numbness of the right anterior thigh with prolonged standing. *Id.* But, "Dr. Burchett's examination of this date was largely unremarkable aside from reference to an increased body habitus." (Tr. 60). The ALJ provided an in-depth explanation of Dr. Burchett's findings – including "no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet," as well as "no evidence for calf tenderness, redness, warmth, cord sign or Homan's [stet] sign." *Id.* Full range of motion through the lower extremities and a normal gait were also noted. *Id.* Finally, the ALJ described Dr. Burchett's report of normal sensory modalities, normally graded deep tendon reflexes bilaterally, and stability in both supine and seated positions; he stated that Dr. Burchett's diagnoses of obesity and meuralgia paresthetica "would appear to be deference given to the claimant's subjective complaints." *Id.* The ALJ also explained that "notwithstanding [plaintiff's] complaints" of pain and swelling in the proximal anteromedial tibial areas, the "associated examination

conducted by Dr. Burchett" in July 2010 "was largely unremarkable" aside from reports of increased body weight and "vague swelling bilaterally . . . in the medial proximal anterior tibial areas." *Id.* Plaintiff's July 2010 visit revealed no evidence of "tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles, or feet." (Tr. 60). Dr. Burchett noted plaintiff's normal gait, her ability to walk on heels and toes, and performance of a squat. *Id.* Similarly, the ALJ provided a detailed review of plaintiff's March 2011 examination by Dr. Burchett. (Tr. 61). During that examination plaintiff reported swelling of her knees and feet, as well as crepitus. Dr. Burchett again discussed plaintiff's increased body habitus, and only noted "mild bilateral crepitus of both knees." *Id.* (internal quotation marks omitted). The ALJ described at length the otherwise normal results from the examination. *Id.*

Finally, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue,* 596 F.3d 959, 966 (8th Cir. 2010). Furthermore, "an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (internal formatting and quotation marks omitted)). In other words, "[t]he ALJ is not required to mechanically list and reject every possible limitation." *Nicolls v. Astrue,* 874 F. Supp. 2d 785, 801 (N.D. Iowa 2012) (citing *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011)). This is especially true with a consulting physician: nothing requires an ALJ to provide reasons for failing to adopt limitations from consulting physicians, as an ALJ would have to do if it were a *treating* physician's opinion. *See Davison v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Nicolls*, 874 F. Supp. 2d at 801–02. Given the depth of

the ALJ's analysis of Dr. Mannis's opinion, it is unlikely that he did not consider the limitations that Dr. Mannis reported. *See Wildman*, 596 F.3d at 966. As in *Wildman*, the ALJ was not bound to accept all of those limitations. *Id.* at 969.

The Court accordingly finds that the ALJ incorporated the impairments and restrictions found credible into the RFC determination, and therefore properly considered Dr. Mannis's opinion. *See McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003).

## Opinion of Dr. Walker

Plaintiff argues that the ALJ did not properly credit the opinion of consulting physician, Lauretta V. Walker, Ph.D. Specifically, plaintiff asserts that "[t]he decision specifically indicated it did consider the medical opinion from Dr. Walker and found the findings in Dr. Walker's exam were not compatible with the severity of the limitations, but failed to point to authority or other evidence to support such a conclusion." [Doc. #13 at 9].

The ALJ stated his reasons for the "minimal evidentiary weight" he gave to the opinion of Dr. Walker (Tr. 64). He noted that Dr. Walker's opinion

> indicated the claimant to be with marked limitation as regards her ability to respond appropriately to usual work situations and to changes in a routine work setting. . . Such limitation is noted incongruous with the relatively unremarkable findings of Dr. Walker's examination. As has been previously detailed already, Dr. Walker's examination was normal except for report of deficient abstracting skills and problematic recall. The examination evidenced a euthymic mood, no unusual motor behaviors, within normal limits speech, coherent and goal directed thought processes, orientation to all spheres, a good fund of basic information, overall average intellectual functioning (on basis of informal evaluation), intact memory for the recall of five digits forward twice and five digits backwards once, and the ability to do simple arithmetic.

*Id.*

As demonstrated by the above-quoted reasoning, the ALJ provided adequate justification for placing minimal evidentiary weight on Dr. Walker's opinion. Namely, the ALJ found that Dr. Walker's narrative observations did not support her ultimate conclusions regarding plaintiff's limitations – the opinion was internally inconsistent. *See Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (reasoning that "[p]hysician opinions that are internally inconsistent . . . are entitled to less deference than they would receive in the absence of inconsistencies.").

Moreover, the ALJ weighed Dr. Walker's findings against the totality of the medical records. The ALJ considered an initial visit to Great Mines Health Center in January 2011, when records show "no adverse mental status findings." (Tr. 61–62). The ALJ also analyzed Great Mines Health Center records from May 2011, November 2011, February 2012, and July 2013. Those documents reflected "continued complaints of anxiety and depression"; however, the ALJ observed that those reports again included "normal mental status findings." (Tr. 62). The ALJ also remarked on a "rather limited record of care pursuit." *Id.*

The opinion of consultative examiner Thomas J. Spencer, Psy.D, also played a role in the ALJ's analysis. "Dr. Spencer's examination of the claimant was largely unremarkable." *Id.* The ALJ explained that Dr. Spencer observed "no impairment in grooming or hygiene," "no unusual motor behaviors or mannerisms," "no "receptive or expressive language deficits," normal thought processes, no suicidal or homicidal ideation, no delusional beliefs, no impairment in long term memory, intact attention

and concentration for the performance of serial threes and the spelling of the word "world" forwards and backwards, and "fairly intact insight and judgment." *Id.* Dr. Spencer assigned plaintiff a GAF of 55 to 60, "a GAF which would indicate that the claimant was believed to be experiencing no greater than moderate symptoms or moderate impairment in social, occupational or school functioning." *Id.*[35] Therefore, the ALJ properly considered and weighed the available medical evidence in formulating plaintiff's RFC. Assuming *arguendo*, the ALJ placed more weight on Dr. Walker's opinion, she still assigned plaintiff a GAF of 57 – "as would be indicative of moderate only symptoms." (Tr. 63). Accordingly, the ALJ did not err in his weighing of Dr. Walker's opinion.

## Plaintiff's Credibility

Plaintiff also argues that the ALJ improperly evaluated her credibility and improperly discredited her subjective complaints of pain. In particular, she takes issue with the ALJ's consideration of her daily activities, arguing that her "minimal activities do not take 8 hours, and the decision fails to articulate how these minimal activities reasonably lead to the conclusion plaintiff has the physical and/or mental wherewithal to sustain work activity on a full-time basis." [Doc. #13 at 11].

In evaluating a claimant's credibility, the ALJ considers the *Polaski* factors: "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication;" and

---

[35] The ALJ did not place any evidentiary weight on the opinion of Gretchen Brandhorst, Psy.D, which indicated that plaintiff was "without any severe emotional impairment(s)," as she had not reviewed subsequent consultative examination reports. (Tr. 64).

"5. functional restrictions." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Moreover, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Wagner*, 499 F.3d at 851. The ALJ must "'make an express credibility determination explaining the reasons for discrediting the complaints.'" *Id.* (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). But, an ALJ is not "required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).

When considering a plaintiff's daily activities as part of a credibility determination, an ALJ may look to "the quality of daily activities . . . and the ability to sustain activities, interests, and relate to others *over a period of time*' and the 'frequency, appropriateness, and independence of the activities must also be considered.'" *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007) (quoting *Reed v. Barnhart*, 399 F.3d 917, 922 (8th Cir. 2005)).  In this vein, the Eighth Circuit has consistently emphasized that "[a] claimant need not prove she is bedridden or completely helpless to be found disabled." *Reed*, 399 F.3d at 923. Notably, if an ALJ "expressly discredits the claimant's testimony and gives good reasons for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart,* 354 F.3d 710, 714 (8th Cir. 2003)).

In this case, the ALJ concluded that plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were "not entirely credible." (Tr. 63).  The ALJ explained that there was a "lack of clinically significant findings on

examinations conducted." *Id.* He also noted that there was a significant "failure of the record to document greater pursuit by the claimant of care from accepted sources." *Id.* The ALJ further explained that the dearth of treatment tended to "suggest either no or tolerable symptomology." (Tr. 63). An ALJ may properly consider the failure to seek medical attention in determining a claimant's credibility. *Basinger v. Heckler*, 725 F.2d 1166, 1170 (8th Cir. 1984).

The ALJ also considered plaintiff's daily activities – which included the ability to (1) attend to personal care activities, (2) attend to the care of her spouse, including administering daily insulin injections, (3) prepare meals, (4) do housework, including laundry, dishes, vacuuming, and cleaning the bathroom, (5) drive a car, (6) shop in stores, (7) manage money, and (8) socialize with family members outside of her home. (Tr. 63). The ALJ *could* take plaintiff's daily activities into account in discrediting her allegations of pain. *Polaski*, 739 F.2d at 1322; *Riggins v. Apfel*, 177 F.3d 689, 692 (8th Cir. 1999).

Additionally, the plaintiff's lack of earnings or nominal earnings over "the majority of years," was a factor considered by the ALJ as undercutting plaintiff's claim that her impairments caused the inability to work. (Tr. 63).

The ALJ sufficiently described and made an express credibility determination on the basis of inconsistencies in the record of a whole, plaintiff's failure to seek treatment, her daily activities, and prior work records. *See Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002). Accordingly, because the ALJ gave good reasons for his credibility determinations, the Court will defer to those conclusions. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (reasoning that a court will not "disturb the decision of an

ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain.").

**D.     Hypothetical Questions to Vocational Expert**

Plaintiff argues that as a consequence of an erroneous RFC determination, the ALJ's hypothetical questions to the vocational expert were improperly formulated. She specifically notes that the RFC did not incorporate the restrictions in Dr. Mannis's medical opinion. [Doc. #13 at 11]. But, "[t]he ALJ's hypothetical question[s] properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit." *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001). As discussed above, the ALJ did not err in his RFC determination, and therefore the hypothetical questions were proper. *See Martise v. Astrue*, 641 F.3d 909 (8th Cir. 2011). "

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed.** A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 16th day of June, 2017.